135 Nev., Advance Opinion 3

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| BOMBARDIER TRANSPORTATION (HOLDINGS) USA, INC., Appellant, vs. NEVADA LABOR COMMISSIONER; THE INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS; AND CLARK COUNTY, Respondents. | No. 71101 <br><br> **FILED** <br><br> JAN 17 2019 <br><br> ELIZABETH A. BROWN <br> CLERK OF SUPREME COURT <br> BY S. Young <br> DEPUTY CLERK |

Appeal from a district court order denying a petition for judicial review of a decision of the Nevada Labor Commissioner. Eighth Judicial District Court, Clark County; Joseph Hardy, Jr., Judge.

*Affirmed.*

Jackson Lewis P.C. and Paul T. Trimmer and Gary C. Moss, Las Vegas, for Appellant.

Aaron Ford, Attorney General, Lawrence J.C. VanDyke, Solicitor General, and Robert E. Werbicky, Deputy Attorney General, Carson City, for Respondent Nevada Labor Commissioner.

Fisher & Phillips LLP and Holly E. Walker and Mark J. Ricciardi, Las Vegas, for Respondent Clark County.

McCracken, Stemerman & Holsberry, LLP, and Richard G. McCracken and Kimberley C. Weber, Las Vegas, for Respondent The International Union of Elevator Constructors.

19-02636

BEFORE THE COURT EN BANC.[1]

## OPINION

By the Court, HARDESTY, J.:

In this appeal we must determine whether Nevada's prevailing wage law requirements apply to none or part of a maintenance contract for an airport shuttle system. Generally, work performed under a maintenance contract is not subject to prevailing wage requirements, as it does not qualify as "public work" under NRS 338.010(15). However, the Labor Commissioner determined that because a portion of the work under the contract at issue in this case is repair work, that work is a "public work" project under NRS 338.010(15) and is not exempt from prevailing wage requirements. We conclude that the Labor Commissioner properly determined that the "repair" portion of a maintenance contract is a public work project under NRS 338.010(15), even if the contract is predominantly for maintenance, and that no exemptions applied that would allow appellant Bombardier Transportation (Holdings) USA, Inc. (Bombardier) to forego paying prevailing wages on that portion of the contract. We further conclude that the Labor Commissioner's decision was supported by substantial evidence and that the Labor Commissioner properly determined that 20 percent of the work involved repair rather than maintenance and was thus subject to the prevailing wage.

---

[1]The Honorable Elissa F. Cadish and the Honorable Abbi Silver did not participate in the decision of this matter. The Honorable Michael L. Douglas, Senior Justice, was appointed by the court to participate in the decision of this matter.

SUPREME COURT
OF
NEVADA

(O) 1947A

## FACTS AND PROCEDURAL HISTORY

In 1985, Bombardier installed an automated transportation system (ATS) at the McCarran International Airport (the airport). The ATS is the shuttle system that delivers passengers to the C and D concourses at the airport. In June 2008, Bombardier and respondent Clark County entered into a five-year contract for maintenance work on the ATS. The contract includes minor and major maintenance tasks.

In October 2009, respondent International Union of Elevator Constructors (the Union), the labor union that represented technicians working on the ATS, filed a complaint with the Labor Commissioner, claiming that Bombardier was not paying the ATS technicians prevailing wage rates. Following a six-day administrative hearing, the Labor Commissioner determined that the contract is a public work project and therefore subject to NRS Chapter 338's prevailing wage requirements. The Labor Commissioner further determined that no statutory exemption applied to exempt Bombardier from paying the ATS technicians prevailing wages for repair work performed under the contract because the contract itself was not directly related to the normal operation or normal maintenance of the airport, nor was Bombardier an exempted railroad company. Distinguishing between tasks requiring skilled or unskilled technicians, the Labor Commissioner concluded that 20 percent of the work under the contract was for major repairs and required payment of prevailing wages. He directed Clark County to "calculate the 20% due to the ATS Technicians who performed work on [the contract]" and to provide that calculation within 30 days.

Bombardier filed a petition for judicial review, challenging the Labor Commissioner's decision. The district court summarily affirmed the Labor Commissioner's decision, but also remanded the decision "solely for

supervision and jurisdiction by the Labor Commissioner over the payment by Bombardier pursuant to calculation to be performed by the Clark County Department of Aviation." Bombardier now appeals the district court order denying its petition for judicial review.

## DISCUSSION

Bombardier challenges the Labor Commissioner's determinations that (1) the contract is a public work project as defined under NRS 338.010(15) (2009),[2] and (2) the contract is not exempt from Nevada's prevailing wage requirements under either NRS 338.011(1) or NRS 338.080, because it is not directly related to the normal operation or normal maintenance of the airport and Bombardier is not a railroad company. Bombardier also argues that substantial evidence does not support the Labor Commissioner's determination that 20 percent of the work under the contract was for repair work and therefore subject to prevailing wages. Finally, Bombardier challenges the Labor Commissioner's classification of the ATS Technicians as Elevator Constructors and the determination that they were entitled to recover prevailing wages on that basis.

### I.

We review an agency's decision under the same standard as the district court, without deference to the district court's decision, and "determine, based on the administrative record, whether substantial evidence supports the administrative decision." *Kay v. Nunez*, 122 Nev.

_____

[2]All references to NRS Chapter 338 are to the statutes as they existed in 2009, when Bombardier filed its complaint. The Legislature has since reorganized certain provisions of Chapter 338, but the statutes at issue here have remained substantively the same.

1100, 1105, 146 P.3d 801, 805 (2006). We defer to the agency's findings of fact, but review its legal conclusions de novo. *State, Dep't of Taxation v. Masco Builder Cabinet Grp.*, 127 Nev. 730, 735, 265 P.3d 666, 669 (2011). We also review de novo statutory interpretation questions in the administrative context and will look to the legislative history to ascertain the Legislature's intent when it is not clear from the statute's plain language. *See State, Dep't of Motor Vehicles v. Taylor-Caldwell*, 126 Nev. 132, 134, 229 P.3d 471, 472 (2010); *see also Valenti v. State, Dep't of Motor Vehicles*, 131 Nev. 875, 878-79, 362 P.3d 83, 85 (2015) (stating that this court will look to the legislative history when it cannot discern the legislative intent from the statute's plain language).

## II.

NRS Chapter 338, Nevada's public works chapter, requires employers to pay workers prevailing wages when the workers perform public work and no exemption otherwise applies. We are asked to determine whether a portion of work done under this maintenance contract qualified as "public work" under NRS 338.010(15), such that it was subject to the prevailing wage requirements. "Public work" is "any project for the new construction, repair or reconstruction of . . . [a] project financed in whole or in part from public money for [a variety of public purposes]." NRS 338.010(15). Bombardier argues that the contract did not qualify as a "public work" for two reasons: (1) it was not a "project," and (2) it was not "for the new construction, repair or reconstruction of . . . [a] project." We address each of these arguments in turn.

### A.

NRS Chapter 338 does not define "project." The Labor Commissioner consulted two dictionaries to determine the ordinary meaning of the term: the *Merriam-Webster's Dictionary* defines "project" as

"a planned piece of work that ha[s] a specific purpose . . . and that usually requires a lot of time"; and the *Cambridge University Academic Content Dictionary* defines "project" as "a piece of planned work or activity that is completed over a period of time and intended to achieve a particular aim."

On appeal, Bombardier argues that a "project" has "a singular, defined end point" and "a schedule with substantial completion dates or other defined objectives." Bombardier agrees with the *Cambridge Dictionary* definition, but also relies on a 2010 version of *Merriam-Webster's Dictionary*, which defines "projects" as "plans or schemes to complete a particular objective in accordance with a defined schedule." Bombardier contends that the contract does not meet this definition because it involved ongoing maintenance work and therefore lacked an endpoint or substantial completion dates. Though Bombardier takes issue with the Labor Commissioner's definition of "project," Bombardier's proffered definitions are not much different: both require a planned undertaking with a specific purpose to be completed over time.

The Labor Commissioner's determination that the contract was a project under NRS 338.010(15) is a question of fact, which we review for substantial evidence. *See Bisch v. Las Vegas Metro. Police Dep't*, 129 Nev. 328, 342, 302 P.3d 1108, 1118 (2013). The Labor Commissioner determined that the contract was a project because the work was performed based on a defined and comprehensive schedule, which was outlined in the contract. Further, the Labor Commissioner explained that the contract lasted for a period of five years and required scheduled routine, preventative, and corrective maintenance. The Labor Commissioner explained that although the contract appeared to be primarily for maintenance work (a Bombardier official testified that 80 percent of it was for maintenance), some of the work

Supreme Court
of
Nevada

(O) 1947A

(the other 20 percent) met the definition of "project." For example, one category of maintenance, "Major Maintenance," included tasks such as replacing major repairable units, performing major repairs, rebuilding and overhauling major components, and repairing spare equipment. Unlike routine maintenance tasks, these tasks contemplated preventive and corrective projects as required at various times over the five-year contract period.

Such tasks were consistent with the definition of "project" because they constitute a planned piece of work for a specific purpose completed over a limited period, and within a contract intended to achieve a particular aim. Thus, while substantial evidence supports a finding that these tasks were a "project," we conclude that the Labor Commissioner's determination that the entire contract was a project and therefore subject to NRS Chapter 338 was overbroad. Based on the contract's schedule and objectives, only the contract provisions providing for "repairs" that exceeded normal maintenance were a "project" within the plain meaning of NRS 338.010(15).

B.

Bombardier argues that regardless of whether the contract is a "project," it was not *for* . . . new construction, repair or reconstruction," as required to be a public work under NRS 338.010(15).[3] (Emphasis added.)

---

[3]Bombardier also contends that, regardless of the ordinary meaning of "project," the contract did not qualify as a "project" under NRS 338.010(15) because that term should be construed only as "construction project." Bombardier advances several arguments to support this position: that the list of examples in the statutory provision are all construction or development projects, that this court's decisions on prevailing wages have

Supreme Court
of
Nevada

(O) 1947A

7

Bombardier contends that the prevailing wage requirements apply only when a contract's primary purpose is for repairs, arguing that this contract's primary purpose was *for* maintenance. Thus, it adds, to the extent the contract included repair work, that work was only incidental to the contract's primary purpose. Bombardier points out that the Labor Commissioner's finding that 80 percent of the contract pertained to maintenance proves that the contract's primary purpose was maintenance and not repair.

We agree with Bombardier that the word "for" can indicate purpose. *See, e.g., For, Merriam Webster's Collegiate Dictionary* (11th ed. 2007) (explaining that "for" can be "used as a function word to indicate purpose" or "to indicate an intended goal"). But NRS 338.010(15) does not require such an all-or-nothing approach when evaluating the contract's

---

involved construction contracts and real property rather than contracts for maintenance, that maintenance contracts in Clark County have generally not been subject to prevailing wages, and that the "financ[ing]" language in NRS 338.010(15) excludes maintenance contracts from the definition of "project" because such contracts are paid for with normal operating funds rather than bonds or long-term debt measures.

We conclude that Bombardier's arguments are belied by the plain language of NRS 338.010(15), which specifically states "any project for the new construction, repair or reconstruction," and notably does not limit the term "project" to "construction project," despite such limitation in other provisions of the statute. *See* NRS 338.010(18)-(20) (2009) (specifically using the term "construction project"); *Coast Hotels & Casinos, Inc. v. Nev. State Labor Comm'n*, 117 Nev. 835, 841, 34 P.3d 546, 550 (2001) ("Generally, when the [L]egislature has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded."). In addition, the financing language in the statute does not require a particular type of funding, only that the project be financed by public money, which the contract was.

SUPREME COURT
OF
NEVADA

(O) 1947A

8

purpose, nor does it exempt hybrid contracts. NRS 338.010(15) defines "public work" as "any project," not an entire contract; it does not state that individual contract provisions cannot be severed and assessed on their own. Such a limitation would run afoul of NRS Chapter 338's purpose and would allow parties to insulate themselves from the statutes' applicability by simply including repair work in a maintenance contract.

While the Legislature exempted normal maintenance contracts, it specifically maintained that public work projects for repair were subject to prevailing wage requirements. *See* NRS 338.010(15). It sought to avoid burdening public bodies with the prevailing wage requirement for small contracts that involved simple, day-to-day tasks. *See* Hearing on A.B. 94 Before the Assembly Government Affairs Comm., 61st Leg. (Nev., Feb. 12, 1981).

Contrary to Bombardier's argument, there is no indication that the Legislature intended to exempt repair work where a project involves both repair and maintenance work. We agree with the Labor Commissioner and the Union that such an approach would allow employers to circumvent prevailing wage laws by including some maintenance work in contracts, which would be inconsistent with the Legislature's intent in enacting NRS Chapter 338. *See City of Reno v. Bldg. & Constr. Trades Council of N. Nev.*, 127 Nev. 114, 118 n.3, 251 P.3d 718, 720 n.3 (2011) ("The prevailing wage laws are meant to ensure that a public body pays a laborer working on a public project no less than the prevailing wage they would receive for the same type of work done for a private employer in that county.").

Next, we turn to whether the contract in this case included repairs as used in NRS 338.010(15). The Labor Commissioner determined that certain tasks under the contract were repairs, despite Bombardier

labeling them "maintenance," because they necessarily required technical training or skills that other tasks did not. For example, the contract listed routine maintenance tasks under "Scheduled Vehicle Maintenance," but also included "[r]eplacing major repairable units," "[p]erforming major repairs," "[r]ebuilding and overhauling major components," and "[r]epairing spare equipment" under the same section. Some of the tasks also involved repairs of station doors, graphics, and occupancy detectors, and the repair and replacement of contactors and isolation switches. Other tasks included repair or replacement of failed equipment or components and major maintenance of the ATS equipment.

The Legislature did not define the term "repair." The verb form of "repair" is defined as "1. [t]o restore to a sound or good condition after decay, waste, injury, partial destruction, dilapidation, etc.; to fix . . . 2. [t]o renew, revive, or rebuild after loss, expenditure, exhaustion, etc." *Repair, Black's Law Dictionary* (10th ed. 2014). These definitions recognize an activity beyond normal maintenance. And the Legislature distinguished tasks that are not repairs by characterizing them as normal maintenance, including such activities like window washing, janitorial and housekeeping services, and fixing broken windows, *see* Hearing on A.B. 94 Before the Assembly Government Affairs Comm., 61st Leg. (Nev., Feb. 12, 1981). Accordingly, we agree with the Labor Commissioner that the contract provisions that are *for* major repair tasks constitute the type of repairs the Legislature intended to subject to NRS 338.010(15).

### III.

Bombardier next argues that the contract was exempt from the prevailing wage laws under NRS 338.011(1) because it was "directly related to the normal operation of the public body or the normal maintenance of its

Supreme Court
OF
Nevada

(O) 1947A

10

property." Bombardier advances a second basis for its exemption, arguing that the contract was exempt under NRS 338.080(1) because it is a railroad company. We conclude that neither of these exemptions apply and that the Labor Commissioner was correct in concluding the same.

## A.

NRS 338.011(1) exempts from the requirements of NRS Chapter 338 any contract "[a]warded in compliance [with government purchasing laws] which is directly related to the *normal operation* of the public body or the *normal maintenance* of its property." (Emphases added.) The Labor Commissioner concluded that these exemptions do not apply because (1) the ATS is not part of the airport's "normal operation," and (2) certain repair work under the contract exceeded "normal maintenance."

## i.

First, we note that NRS 338.011(1) does not define the phrase "directly related to the normal operation of the public body." The Labor Commissioner adopted a narrow reading of this provision. He explained that while the ATS is the primary method of transporting passengers around the airport property, it is not the only method; its importance to the airport does not mean that it directly relates to the airport's normal operation. The Labor Commissioner determined that the normal operation of the airport is to fly and land airplanes and to transport passengers via airplanes, explaining that "[p]lanes would take off and land; passengers would make it to their destinations," even without the ATS.

Conversely, Bombardier argues that the ATS has been essential to the airport since 1982, and that the airport has relied on the ATS to transport passengers to new areas of the airport in its development and

expansion projects. Thus, according to Bombardier, the exemption applies because the ATS has been and will continue to be essential to the airport.

The Union argues, and we agree, that Bombardier reads this exception too broadly. The exception for projects related to "the normal operation of the public body" cannot swallow Nevada's prevailing wage requirement rule. Such an interpretation would result in every project at the airport being exempt from public work projects. And, while we agree with both the Union and Labor Commissioner that NRS 338.011(1) should be read narrowly, we cannot wholly defer to the Labor Commissioner's interpretation of the statute because he failed to support his interpretation with any authority. *See Nev. Pub. Emps. Ret. Bd. v. Smith*, 129 Nev. 618, 625, 310 P.3d 560, 565 (2013) (providing that while we defer to an agency's interpretation of its statute, this interpretation is only persuasive). Such an interpretation, while consistent with the statutory text, loses its persuasive value.

We take this opportunity to define "directly related to the normal operation of the public body" as stated in NRS 338.011(1). The plain meaning of "directly related" is an immediate or straightforward connection or relationship between two things. *See Directly, Black's Law Dictionary* (10th ed. 2014) (defining "directly" as "[i]n a straightforward manner," and "immediately"); *id.* at *Related* (defining "related" as "[c]onnected in some way; having relationship to or with something else"). Further, "normal" is defined as "[a]ccording to a regular pattern; . . . forces that operate periodically or with some degree of frequency." *See id.* at *Normal*. Finally, "operational," the adjective form of "operation" means "able to function." *See id.* at *Operational*. Accordingly, a contract is "directly related to the normal operation of a public body" when it has an immediate relationship

to the regular way in which the public body functions. We also agree with the Labor Commissioner that "directly" modifies "related," and we read this as a narrow exception to Nevada's prevailing wage law.

Satisfied with this definition, we answer whether the Labor Commissioner's conclusion is supported by substantial evidence. "Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion." *Schepcoff v. State Indus. Ins. Sys.*, 109 Nev. 322, 325, 849 P.2d 271, 273 (1993). We do not "reweigh evidence or witness credibility." *Bisch*, 129 Nev. at 342, 302 P.3d at 1118.

Bombardier contends that substantial evidence does not support the Labor Commissioner's conclusion that this contract was not directly related to the airport's normal operation. Bombardier rests its argument on the testimony of the former Director of Aviation for the airport, Randall Walker, who testified that it would be impossible to manage the C and D gates without the ATS. Walker explained that the ATS is the only method of transportation to the D gates, but that there are other ways to get to the C gates. Walker further testified that on one occasion, all of the ATS equipment shut down, resulting in delayed and missed flights.

We agree that transporting passengers between gates is an important airport operation. Nevertheless, we agree with the Labor Commissioner that the contract was not directly related to the normal operation of the airport, but for a different reason. The issue here is not whether the ATS is part of the normal airport operation, but rather whether the *repair portion of this contract* was directly related to the *normal* operation of the airport or its property. We conclude that it was not.

Contract provisions not subject to the prevailing wage laws are only those that the Legislature intended to exempt. *See supra*, Section

II(B). Here, the contract provisions containing major repairs were not exempt because they were not directly related to the normal operation of the airport. Walker's testimony that on a single occasion, the ATS broke down and caused havoc cuts against Bombardier's argument because it illustrated that such *abnormal* events—those that require major repair of the ATS—were not *normal* operations. Walker's testimony and the contract demonstrate that such major repairs were not immediately related to the regular way in which the airport functions. Further, the Labor Commissioner determined that Bombardier submitted no other evidence to support its argument. Accordingly, we agree, but for different reasons, with the Labor Commissioner that this exemption does not apply. *Saavedra-Sandoval v. Wal-Mart Stores, Inc.*, 126 Nev. 592, 599, 245 P.3d 1198, 1202 (2010) (providing that this court will affirm a judgment that reached the correct result, even if arrived at for the wrong reason).

ii.

Second, we turn to the Labor Commissioner's conclusion that the contract was not exempt from the prevailing wage requirement under NRS 338.011(1) because it was not "directly related to . . . the normal maintenance" of the airport. The essence of Bombardier's argument is that the exemption should apply because all maintenance contracts involve some element of repair; thus, it asks us to look at the contract's overarching maintenance purpose. We are asked to determine whether the major repairs listed in the contract, identified above, were "directly related to . . . the normal maintenance" of the airport.

NRS Chapter 338 does not define "normal maintenance." The Labor Commissioner defined "normal maintenance" as "work that does not require a lot of skill or training (i.e., janitorial services), not work that

requires training and technical skills." Relying on this definition, the Labor Commissioner found that tasks under the contract that did not require technical skills were exempted from the prevailing wage requirement. The tasks that involved repair work, on the other hand, exceeded "normal maintenance."

"Normal" means "conforming to a . . . regular pattern." *Normal*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2014). "Maintenance" means "[t]he care and work put into property to keep it operating and productive; general repair and upkeep." *Maintenance*, *Black's Law Dictionary* (10th ed. 2014). Thus, normal maintenance is a patterned upkeep of property to keep it operating.

Repairs, on the other hand, cannot be part of this normal upkeep because they necessarily require decay or waste, and the restoration thereof. *See Repair*, *Black's Law Dictionary* (10th ed. 2014). The contract's language is consistent with this distinction because it plainly segregates tasks based on the amount of effort and skill required to complete them. It is clear the Legislature did not consider the terms as synonymous; it intended to exempt maintenance work, which could include minor, day-to-day repairs, while requiring payment of prevailing wages on public work projects involving major repairs. *See* Hearing on A.B. 94 Before the Assembly Government Affairs Comm., 61st Leg. (Nev., Feb. 12, 1981). It would produce an absurd result to read "repair" into what NRS 338.011 has qualified as "normal" operations and maintenance, because the statute plainly aims to exempt tasks not included in "repair." *See* NRS 338.010(15) (applying prevailing wage requirements to "repair" projects).

These major repairs were not directly related to the normal maintenance of the airport because they exceeded day-to-day upkeep. This

interpretation is consistent with the statute's plain language and reflects the Legislature's intent. *See Valenti*, 131 Nev. at 878-79, 362 P.3d at 85. Accordingly, we agree with the Labor Commissioner's interpretation that major repair tasks in the contract, while listed as maintenance, were actually "repairs" and therefore outside the scope of the phrase ". . . directly related . . . to the normal maintenance" of the airport.

B.

Bombardier next argues that it was exempt from paying prevailing wages because it is a railroad company, which is exempt under NRS 338.080(1). NRS 338.080(1) exempts from the prevailing wage requirements:

> [a]ny work, construction, alteration, repair or other employment performed, undertaken or carried out, by or for any railroad company or any person operating the same, whether such work, construction, alteration or repair is incident to or in conjunction with a contract to which a public body is a party, or otherwise.

The Labor Commissioner determined that Bombardier was not exempt under this statute because (1) the ATS is not a railroad and (2) Bombardier does not hold itself out as a railroad company.

First, neither NRS Chapter 338 nor the legislative history define what type of "work" is considered "for [a] railroad." The Labor Commissioner determined that the ATS is not a traditional railroad because it does not run on steel rails nor is it drawn by a locomotive. *See Westinghouse Elec. Corp. v. Williams*, 325 S.E.2d 460, 463 (Ga. Ct. App. 1984) (holding that an airport transit system operating on a guideway was not a railroad). This interpretation is consistent with the common meaning of railroads and other statutes wherein the Legislature has defined railroads as operating on railways. *See, e.g.*, NRS 484A.200 (defining

"railroad" as one that operates on "stationary rails"); NRS 484B.050 (same); NRS 710.300 (requiring a "railway" or "railway lines" for railroad utilities). Further, this interpretation is consistent with the testimony of Bombardier's director of services, who testified that the shuttle operates on a guideway between two stations. It lacks rails and operates unmanned cars with rubber tires on an elevated, concrete, single-track guideway within the facility. It also does not switch lanes or require an operator, nor does it include other features common to railroads and trains. Therefore, we conclude that the ATS is not a railroad under NRS 338.080(1).

Second, even though the ATS is not a railroad, Bombardier argues that it could be exempt as a railroad company. Neither NRS Chapter 338 nor the legislative history define the term "railroad company." The Labor Commissioner did not define the term "railroad company," but the term is defined by Black's Law Dictionary as "[a] corporation organized to construct, maintain, and operate railroads." *Railroad Corporation, Black's Law Dictionary* (10th ed. 2014). Bombardier cannot be a railroad company because it is not maintaining or operating a railroad—the ATS is not a railroad. Moreover, if Bombardier were a railroad company, the Public Utilities Commission would regulate it.[4] *See* NRS 704.020 (defining railroads as public utilities subject to the Commission's regulation).

We recognize the Legislature's intent to specifically regulate railroads as public utilities, and seeing no evidence that Bombardier is a railroad company, we hold that it cannot claim this exemption.

---

[4]We decline to consider whether Bombardier's other maintenance projects on light rails, monorails, and its out-of-state railroad holdings make it a railroad company because such projects are not exempted under NRS 338.080(1). We also reject the Labor Commissioner's conclusion that NRS 338.080(1) applies only to Nevada railroad companies.

IV.

The Labor Commissioner determined that 20 percent of the maintenance work under the contract deemed "corrective maintenance" was public work because it "involved repair, replacement, rebuilding or modifying [the] ATS components." He concluded that calling such work "maintenance" was a "misnomer."

Bombardier challenges the Labor Commissioner's determination, arguing that the employee work summaries relied on to reach this determination were inadmissible hearsay evidence.[5] Having relied on inadmissible evidence, Bombardier argues, the Labor Commissioner's conclusion is not supported by substantial evidence. We conclude that the Labor Commissioner properly considered the employee work summaries because the information allowed him to have a more complete record from which to ascertain the facts and resolve the case. Procedural and evidentiary rules are relaxed in administrative proceedings. *Dutchess Bus. Servs., Inc. v. Nev. State Bd. of Pharmacy*, 124 Nev. 701, 711, 191 P.3d 1159, 1166 (2008) (acknowledging that "proceedings before administrative agencies may be subject to more relaxed procedural and evidentiary rules"). Moreover, the Labor Commissioner is not bound by the technical rules of evidence in such proceedings, NAC 607.410(1), and may

---

[5]On appeal, Bombardier argues that the primary work summary exhibit was inadmissible under NRS 52.275, which concerns the admissibility of voluminous writings. However, Bombardier did not argue that as a basis for excluding the summaries to either the Labor Commissioner or to the district court in its petition for judicial review, so we need not consider it here. *See State ex rel. State Bd. of Equalization v. Barta*, 124 Nev. 612, 621, 188 P.3d 1092, 1098 (2008) ("[T]his court generally will not consider arguments that a party raises for the first time on appeal.").

 

exercise his discretion in deviating from the technical rules of evidence if doing so "will aid in ascertaining the facts," NAC 607.410(2). Admitting and relying on these work summaries was plainly within the Labor Commissioner's discretion.

Additionally, these summaries were not the sole basis for the Labor Commissioner's determination regarding the work; he also considered the employees' testimony about their experience working on different tasks for the ATS. In addition, he considered the contract itself, which distinguished between "preventive maintenance" work and "corrective maintenance" work. Based on the tasks listed under each, the Labor Commissioner concluded that 80 percent of the work under the contract was "preventive maintenance" work and 20 percent was "corrective maintenance" work. The Labor Commissioner concluded that the "corrective maintenance" tasks were better categorized as repair work, requiring Bombardier to pay prevailing wages for that 20 percent. The Labor Commissioner's approach in allocating prevailing wages based on the type of work performed under the contract is consistent with the language and intent of the statute. *See Taylor v. State, Dep't of Health & Human Servs.*, 129 Nev. 928, 930, 314 P.3d 949, 951 (2013). Accordingly, we conclude that there was substantial evidence supporting the Labor Commissioner's conclusion that the contract was comprised of 20 percent repair work. *See Bisch*, 129 Nev. at 334, 302 P.3d at 1112.

V.

Next, Bombardier argues that the Labor Commissioner improperly shifted the burden of proof in requiring Bombardier to prove damages because, under *Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, the employees, as the party seeking damages, have the burden

to demonstrate which tasks constituted covered repairs and how much of that work they performed. 105 Nev. 855, 857, 784 P.2d 954, 955 (1989). Bombardier also argues that the Labor Commissioner incorrectly excused the Union from having to prove damages after determining that Bombardier did not maintain adequate records, which it disputes. Rather, Bombardier contends that its records were reliable because they were completed by the employees and, regardless, it was not on notice that it had to maintain prevailing wage records. Bombardier's reliance on *Mort Mallin of Lake Tahoe* is misplaced. That case involved a tort-based action, which was not subject to NRS Chapter 338.

Pertinent here, NRS 338.090(2)(a) requires that the Labor Commissioner "assess a person who, after an opportunity for a hearing, is found to have failed to pay the prevailing wage required pursuant to [NRS Chapter 338]." There is no reference to which party has the burden to prove this amount. The Labor Commissioner is to award "an amount equal to the difference between the prevailing wages required to be paid and the wages that the contractor or subcontractor actually paid." NRS 338.090(2)(a). This provision authorizes the Labor Commissioner to deduce the amount of damages from the evidence presented at the hearing.

The Labor Commissioner considered evidence that Bombardier and the Union provided. The Labor Commissioner faulted Bombardier with any inaccuracies in the employment records because Bombardier did not encourage ATS technicians to track their hours accurately or on a task-specific basis. Moreover, the Labor Commissioner noted that after the ATS technicians entered their hours, "someone other than the worker"—referring to an administrative employee—entered or adjusted the hours and tasks originally reported, without personal knowledge of what work the

Supreme Court
of
Nevada

(O) 1947A

ATS technicians actually performed. The Labor Commissioner is correct that "employees, who have performed work for which they have not been properly compensated, should not be penalized for the employer's failure to keep accurate records as required by law." This is precisely what the United States Supreme Court held in interpreting the burden of proof an employee seeking benefits had to prove under the Fair Labor Standards Act. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded by statute on other grounds as recognized in Integrity Staffing Sols., Inc. v. Busk*, ___ U.S. ___, ___, 135 S. Ct. 513, 516-17 (2014). Therefore, we agree with the Labor Commissioner that there was "a just and reasonable inference" that prevailing wages were required for 20 percent of the work completed under the contract as that work constituted repair work. Further, the Labor Commissioner did not err in assessing damages as he analyzed evidence from both parties to determine the amount of damages. *See* NRS 338.090(2)(a).

## VI.

Finally, Bombardier argues that the Labor Commissioner engaged in unauthorized rulemaking and exceeded his authority by concluding that the ATS technicians were properly classified as "Elevator Constructors." "[T]he Labor Commissioner has the authority to determine and distinguish classifications of workers" and is obliged to "define a classification or type of work and then to determine the prevailing wage for that classification." *City Plan Dev., Inc. v. Office of Labor Comm'r*, 121 Nev. 419, 432, 117 P.3d 182, 190-91 (2005).

The Labor Commissioner determined that the contract did not properly classify the ATS technicians. Relying on the Office of the Labor Commissioner's posted 2008 job descriptions for public work projects, the

Labor Commissioner found that the ATS technicians' proper job classification was "Elevator Constructor." The Labor Commissioner determined that this job description applied to the ATS technicians because, like elevators, the ATS functions as an automated people mover. Further, the Labor Commissioner determined that the ATS technicians performed several of the same tasks and used the same tools as employees classified under the "Elevator Constructor" job description. We conclude that Bombardier's argument lacks merit because the Labor Commissioner was not engaging in ad hoc rulemaking. Rather, he "simply applied the evidence to his predefined classifications to determine each claimant's appropriate wage," which he has authority to do under NRS Chapter 338. *City Plan Dev.*, 121 Nev. at 432, 117 P.3d at 191.

## CONCLUSION

We conclude that the "repair" portion of the contract in this case was a public work project under NRS 338.010(15), and no exemptions apply that allow Bombardier to forego paying prevailing wages to the ATS technicians who performed repair work under the contract. The Labor

Commissioner's factual findings were supported by substantial evidence. Accordingly, we affirm the district court's denial of the petition for judicial review.

_____, J.
Hardesty

We concur:

_____, C.J.
Gibbons

_____, J.
Pickering

_____, J.
Parraguirre

_____, J.
Stiglich

_____, Sr. J.
Douglas

Supreme Court
of
Nevada

(O) 1947A